**Nos. 24-7599 & 25-483**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

*IN RE RIPPLE LABS, INC. LITIGATION*,

BRADLEY SOSTACK, on behalf of himself and all others similarly situated,

*Lead Plaintiff-Appellant*

v.

RIPPLE LABS, INC.; XRP II, LLC; BRADLEY GARLINGHOUSE,

*Defendants-Appellees*.

On Appeal from United States District Court
for the Northern District of California,
No. 4:18-cv-06753-PJH; Hon. Phyllis J. Hamilton

# REPLY BRIEF FOR LEAD PLAINTIFF-APPELLANT

**PROVISIONALLY FILED UNDER SEAL**

MARC M. SELTZER
STEVEN G. SKLAVER
OLEG ELKHUNOVICH
NICHOLAS N. SPEAR
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
nspear@susmangodfrey.com

JAMES Q. TAYLOR-COPELAND
MAX AMBROSE
TAYLOR-COPELAND LAW, P.C.
501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 400-4944
james@taylorcopelandlaw.com
maxambrose@taylorcopelandlaw.com

JASON BELL
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
(212) 336-8330
jbell@susmangodfrey.com

*Counsel for Lead Plaintiff-Appellant Bradley Sostack and Class Counsel*

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 4

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON REPOSE. ..... 4

A. A REASONABLE JURY COULD CONCLUDE THAT RIPPLE DID NOT MAKE ONE CONTINUOUS OFFERING OF THE SAME SECURITIES FROM 2013 ON. ..... 4

B. THE COURT SHOULD DISREGARD RIPPLE'S ABANDONMENT OF *MURPHY*. ..... 12

C. RIPPLE IS WRONG THAT SOSTACK FORFEITED ARGUMENTS THAT RIPPLE OFFERED DIFFERENT XRP SECURITIES IN 2017. ..... 14

D. A REASONABLE JURY COULD CONCLUDE THAT XRP INVESTMENT CONTRACTS WERE NOT BONA FIDE OFFERED TO THE PUBLIC BEFORE 2017. ..... 17

II. RIPPLE SOLICITED XRP PURCHASES. ..... 21

III. THIS COURT CAN AND SHOULD ADDRESS THE SCOPE OF THE CLASS, THE *DAUBERT* ORDER, AND COSTS ..... 25

IV. THE DISTRICT COURT IMPROPERLY LIMITED THE CLASS. ..... 26

CONCLUSION ..... 27

CERTIFICATE OF COMPLIANCE ..... 29

# TABLE OF AUTHORITIES

## Cases

*Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*,
38 F. 4th 68 (9th Cir. 2022) ....................15

*Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*,
248 F.3d 892 (9th Cir. 2001) ....................25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................3, 5

*Arroyo v. Rosas*,
19 F. 4th 1202 (9th Cir. 2021) ....................26

*Bowerman v. Field Asset Servs., Inc.*,
60 F. 4th 459 (9th Cir. 2023) ....................25

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*,
582 U.S. 497 (2017)....................18

*Caviness v. Derand Res. Corp.*,
983 F.2d 1295 (4th Cir. 1993) ....................13

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024)....................13

*Enserch Corp. v. Shand Morahan & Co.*,
952 F.2d 1485 (5th Cir. 1992) ....................26

*Guitron v. Wells Fargo Bank, NA*,
619 F. App'x 590 (9th Cir. 2015) ....................26

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)....................24

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001) ....................12

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) .................... 24, 25

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) ....................11

*Houghton v. Leshner*,
2023 WL 6826814 (N.D. Cal. Sept. 20, 2023)....................23

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014)....................27

*Johnson v. City of Shelby*,
574 U.S. 10 (2014).................... 10, 15

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)....................27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)....................13

*Owen v. Elastos Found.*,
2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021)....................23

*P. Stolz Family Partnership L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)....................14

*Pino v. Cardone Cap., LLC*,
55 F. 4th 1253 (9th Cir. 2022).................... 4, 23, 24

*Pinter v. Dahl*,
486 U.S. 622 (1988).................... 4, 21, 22, 24

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003)....................23

*Samuels v. Lido DAO*,
757 F. Supp. 3d 951 (N.D. Cal. 2024).................... 23, 24, 25

*Schlueter v. Cozad*,
674 F. Supp. 1351 (C.D. Ill. 1987)....................13

*SEC v. Caledonian Bank Ltd.*,
145 F. Supp. 3d 290 (S.D.N.Y. 2015)....................19

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980).................... 1, 4, 8

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007)....................12

*SEC v. Ripple Labs, Inc.*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023) ....................................................10

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)...........................................................................16

*Shen v. Garland*,
109 F. 4th 1144 (9th Cir. 2024) ..........................................................15

*United Housing Found., Inc. v. Forman*,
421 U.S. 837 (1975)................................................................ 2, 15, 16

*United States v. Blackstone*,
903 F.3d 1020 (9th Cir. 2018) ............................................................20

*Vassilatos v. Ceram Tech Int'l, Ltd.*,
1993 WL 177780 (S.D.N.Y. May 19, 1993) ........................................13

*Warfield v. Alaniz*,
569 F.3d 1015 (9th Cir. 2009) ..............................................................6

*Wildes v. BitConnect Int'l PLC*,
25 F. 4th 1341 (11th Cir. 2022) ..........................................................23

*Yates v. Munic. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ..............................................................18

**Statutes**

15 U.S.C. § 77d(a)(3)(A) .........................................................................13

15 U.S.C. § 77m............................................................................ 13, 14, 17, 20

## INTRODUCTION

Summary judgment was erroneously granted because a reasonable jury could conclude that Ripple did not (1) make a continuous offering of the same XRP securities from 2013 through 2017, or (2) make a bona fide offer of those securities to the public before 2017. Ripple does not meaningfully attempt to show that it could prevail under the usual summary judgment standard on either of these grounds. Instead, Ripple launches a campaign of misdirection—disavowing its principal positions below, mischaracterizing Sostack's arguments as forfeited, and incorrectly asserting there are no genuine disputes of material fact. This Court should reverse.

Ripple convinced the district court that *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), dictates when separate securities offerings trigger separate repose periods. But the district court misapplied *Murphy* by erroneously adopting Ripple's claim that it made a continuous offering of the same XRP security from 2013 on. A reasonable jury could conclude that Ripple made a *separate* offering in 2017. That year, Ripple fundamentally changed (i) the economic reality of XRP investment contracts by releasing XRP from escrowed tranches on a regular supply schedule, (ii) where and how Ripple offered those securities (through market makers on third-party exchanges), (iii) why Ripple offered these investments (to support a new cross-border payments product), and (iv) to whom they were offered ("average Joe" and "mom and pop" investors).

Because it cannot defend the district court's analysis, Ripple now abandons the very arguments it pressed below. On appeal, Ripple asserts that *Murphy* is "irrelevant" and criticizes Sostack for applying the test that Ripple persuaded the district court to adopt.

Ripple got one thing right below: *Murphy* controls. No one disputes that a separate offering must be separately registered, and that liability attaches under Section 12(a)(1) for each unregistered offering. Section 13 only prohibits claims based on an unregistered offering brought more than three years after that offering, regardless of whether the issuer previously made separate offerings. Ripple's contrary argument has no basis in Section 13 and defeats the core requirement of the Securities Act: that each separate offering be separately registered with disclosures for the protection of investors.

Ripple suggests that even offering a different security would not start the repose period as long as the mere name of the security stays the same. Red Br. 31–32. That contravenes the rule that "the economic realities" of a transaction—not the "name" of the instrument—determine when the repose period starts. *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). It also conflicts with the evidence because XRP was not even uniformly known by that name until Ripple rebranded it in 2017.

When Ripple finally gets to the facts, it misapplies the summary judgment standard by, in effect, asking this Court to view the evidence most favorably to Ripple. The correct question is whether, viewing the evidence in the light most favorable to Sostack and drawing all reasonable inferences in his favor, "a reasonable jury could return a verdict for" the class he represents. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The record here is replete with evidence that would allow a jury to find that Ripple made a separate offering of securities in 2017 and that Ripple offered new XRP investment contracts that year. A reasonable jury could find against Ripple based on the testimony of Ripple executives, their admissions in internal documents, and the public record that shows how Ripple fundamentally transformed its offerings in 2017.

Moreover, it is bedrock law that an offering to sophisticated investors is *not* a "bona fide" offer to the public that starts the running of the repose clock. *See* Red Br. 23–24. A reasonable jury could conclude that before 2017, the year that Ripple first made a concerted effort to open XRP trading to ordinary consumers, only crypto cognoscenti could transact in XRP. Whether these early insiders with deep knowledge of how crypto assets work and unique ability to engage in technically complex digital transactions are different from unsophisticated investors is yet another fact issue for the jury.

Ripple finally attempts to revive a different argument that the district court never reached on summary judgment—that Ripple cannot be liable unless Sostack bought directly from it. That theory contradicts the Supreme Court's decision in *Pinter v. Dahl*, which held that a person who solicits the sale of a security for financial gain can be held liable under Section 12(a)(1). 486 U.S. 622, 647 (1988). To evade *Pinter*, Ripple suggests that a solicitor could be liable if and only if it "acts in concert with" the seller. Section 12(a)(1) and *Pinter* include no such requirement, and this Court rejected a similar attempt to artificially narrow *Pinter* in *Pino v. Cardone Capital, LLC*, 55 F. 4th 1253 (2022).

## ARGUMENT

### I. The District Court Erred in Granting Summary Judgment on Repose.

#### A. A Reasonable Jury Could Conclude that Ripple Did Not Make One Continuous Offering of the Same Securities from 2013 On.

Under *Murphy*, or any other principled analysis of the economic reality of XRP securities, a reasonable jury could conclude, in Ripple's own words, that "Things Ha[d] Changed" in 2017 such that the repose period started then. 4-ER-771. To identify separate offerings, *Murphy* holds that courts must consider whether offerings "are part of a single plan of financing," "involve issuance of the same class of securities," "are made at or about the same time," are for "the same kind of consideration," and "are made for the same general purposes." 626 F.2d at 645. A reasonable jury could find from the record evidence cited in Sostack's opening brief

that in 2017, Ripple for the first time began to target what it called "average Joe" and "mom and pop" investors, promising them that they could expect XRP to appreciate based on Ripple's efforts. And for the first time, Ripple offered XRP to unsophisticated retail investors over third-party exchanges. This vastly different plan of financing and distribution also had a new purpose of supporting a new cross-border payments product. The cornerstone of Ripple's plan was to transform XRP into a new type of investment by, for the first time, placing 50 billion XRP into escrow tranches that would unlock on a regular supply schedule. Blue Br. 30–36, 39–42.

Ripple repeatedly argues that Sostack "fails to show" that this description of Ripple's conduct is true, Red Br. 34–38, but that is not Sostack's burden. Summary judgment is improper if "the evidence is such that a reasonable jury could return a verdict" for the class on repose. *Anderson*, 477 U.S. at 248. Genuine disputes about the material facts preclude summary judgment here.

Ripple's contrary evidence at most creates a genuine fact dispute about whether, in some respects, Ripple's conduct pre- and post-2017 was similar. Ripple points to a few isolated statements made between 2013 and 2015 about how liquidity was important, XRP could be used for cross-border transactions, and Ripple would work to build the value of XRP. But Ripple does not explain why these statements mean that *no* reasonable jury could credit the contrary testimony of Ripple

executives, their statements in internal documents, and the public record about how Ripple materially changed its XRP offerings in 2017. Ripple did not even rely on this evidence—much of which is cherry-picked statements from the amended complaint, and not from the summary judgment record—to show why the claim is time-barred as a matter of law. Isolated ambiguous paragraphs plucked from a pleading hardly establish that there is no genuine issue of material fact.

The evidence about the escrow is alone sufficient for a reasonable jury to conclude that post-escrow, Ripple made separate offerings of a new XRP security. Pre-2017, (i) Ripple had never adopted a supply schedule for XRP, (ii) the value of XRP was subject to massive and immediate dilution from the 50 billion XRP that Ripple had available to it, (iii) this "overhang" depressed the price of XRP and disincentivized investors, and (iv) the escrow fundamentally changed the economic reality of a new XRP investment. Blue Br. 11–14, 39–42.

Ripple's spin to counter these facts is meritless and, at best, present questions for the jury. The escrow obviously "affect[ed] XRP bought by others," Red Br. 37, because by giving investors a "predictable supply schedule," as Ripple's CEO put it, 7-ER-1529, Ripple changed the "objective" "character of the" XRP "transaction offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (citation omitted). A buyer who bought XRP in 2015 and sold it on August 1, 2016 for the going rate of $0.006 purchased a token

subject to an *unrestricted* supply. But a buyer who bought XRP on August 1, 2018 obtained an investment contract subject to a *restricted* supply schedule valued about 7650% more. 4-ER-630–31 The reason for this is simple: purchasers were led to expect something different about the economic reality of XRP—that Ripple could no longer dilute it.[1] Nor is it true that every reasonable jury would conclude that "XRP units sold before the escrow" were "identical to all other XRP in [their] . . . function," if that even mattered. Red Br. 37. To implement the escrow, Ripple needed to alter the software of the XRP Ledger itself. 8-ER-1563–65; 4-ER-815 (225:4-15); 4-ER-764. These changes "fundamentally altered XRP." 2-ER-268 n.5.

This Court need go no further to reverse. But there are additional genuine disputed fact issues from which a reasonable jury could conclude that Ripple made separate offerings of separate securities.

*First*, there is a dispute regarding whether Ripple's limited pre-2017 programmatic sales on the XRP Ledger were in fact directed to retail investors. Red Br. 33–34. To give just a few examples, as Ripple's VP of Marketing put it shortly before Ripple launched its new strategy to target unsophisticated "average Joe" and "mom and pop" investors in 2017, there was "no easy, convenient way to buy

[1] Ripple quibbles that Sostack sought certification of a class period that included sales that occurred 13 days before the escrow announcement. Red Br. 38. But the class that was certified starts after the escrow announcement. 1-ER-56. And whether XRP is a security is a different issue from whether the economics of investment contracts changed such that different offerings were made.

[XRP].” 8-ER-1594. And Ripple publicly stated that it “[did] not sell XRP to consumers.” 4-ER-779. A reasonable jury could agree with Ripple’s own contemporaneous statements.

The fact that a few retail investors may have acquired XRP pre-2017 is not dispositive. *See* Red Br. 34. What matters is Ripple’s “plan of financing.” *Murphy*, 626 F.2d at 645. Evidence shows that, pre-2017, Ripple had “no distribution strategy” and certainly had not adopted a distribution strategy targeted towards retail investors before then. 7-ER-1534. But in March 2017 Ripple adopted a new plan of financing: “a new(ish) development solidified,” “to invest our near-term energy into attracting speculators.” 7-ER-1534.

*Second*, Ripple argues that no reasonable jury could conclude that before 2017, XRP was not “‘readily available for trading’ by members of the public.” Red Br. 35. Whether Ripple offered XRP on third-party exchanges pre-2017, and whether average Joes could buy XRP then, are hotly disputed. Indeed, the evidence shows that Ripple’s executives had trouble buying XRP as late as early 2017. Blue Br. 31. A product is not indisputably “readily available” for trading by retail investors based solely on evidence that some transactions occurred on technically sophisticated platforms.

*Third*, Ripple argues that no one could reasonably conclude that Ripple’s new strategy in 2017 of targeting retail investors on third-party exchanges had a new

purpose of creating liquidity for a new cross-border payments product. Red Br. 36–37. But Ripple does not point to a single piece of undisputed evidence that shows that Ripple (i) had previously targeted retail investors to support liquidity for this product, which did not launch until the end of 2017, 7-ER-1348 (90:2-9), (ii) took any steps pre-2017 to develop liquidity to support this product, (iii) had previously engaged in programmatic sales to retail investors on third-party exchanges to promote liquidity—or (iv) had taken any concrete steps to promote liquidity at all. A jury could instead credit the contrary evidence that Ripple hired Miguel Vias as Head of Markets in November 2016 as part of its push to build liquidity for a cross-border payments system, and that Ripple's "focused efforts to build [XRP] liquidity" had only just begun in May 2017, as Garlinghouse said. 8-ER-1555; *see* Blue Br. 9–10. Nor does Ripple dispute that its separate offering to retail investors in 2017 was used to finance this new payments system. *See*, *e.g.*, 4-ER-655.[2]

*Fourth*, Ripple argues that no reasonable jury could find that "only in 2017 did Ripple's public statements 'link[] the fortunes of retail investors to the success of the company.'" Red Br. 34. But many of the statements on which Ripple relies date or refer to the 2017 period. *See id.* at 9 (*e.g.*, 7-ER-1427 (358:7-359:12); 7-ER-

[2] Ripple mischaracterizes Sostack's argument below that "Ripple received money from all purchases of XRP" and "used these pooled funds to further develop the XRP ledger" as pertaining to all XRP sales from 2013. Red Br. 32–33 (emphases omitted). This passage, however, refers to revenues from programmatic sales in 2017. 2-ER-286 (citing 2-ER-269).

1513 (350:5-352:5); 4-ER-782). And Ripple does not challenge the district court's implicit conclusion that various statements made pre-2017 were not widely enough distributed to create an investment contract. *See* 1-ER-36 (quoting *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 329–30 (S.D.N.Y. 2023)). Nor could it, as that conclusion is consistent with Ripple's assertion in the parallel SEC case that a "handful of documents from 2013 to 2015, none widely disseminated to the public," were "irrelevant" to the 2017 *Howey* analysis. *SEC v. Ripple*, No. 20-cv-10832, ECF 729, at 37 (S.D.N.Y.). For instance, the statement Ripple quotes linking "consumers" to the success of the company is among the documents the district court agreed had not been disseminated broadly. 5-SER-965–66 ("Deep Dive"); 682 F. Supp. 3d at 319 (discussing "Deep Dive"). A reasonable jury could find that, drawing all inferences for Sostack, Ripple did not until 2017 adopt a "financing plan" that "linked the fortunes of retail investors to the success of the company," Blue Br. 32, notwithstanding sporadic earlier statements about the desire to improve XRP's ecosystem.[3]

*Finally*, Ripple does not contest that its offerings were "episodic" such that it would have been required to file a separate registration for each, as it told the SEC.

[3] Ripple references Sostack's characterization in his complaint of certain pre-repose statements. *See* Red Br. 34–35. The district court, however, focused on 2017, and the pleadings do not restrict the arguments Sostack may make based on the evidence opposing summary judgment. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). Ripple also lost its motion to dismiss this pleading on repose grounds.

8-ER-1730. Ripple instead says that if it solicited XRP sales by others, there were not any pauses in its sales. Red Br. 38–39. But whether Ripple solicited sales of XRP securities pre-2017 is a disputed question of fact and raises an entirely different question from whether Ripple made episodic, unregistered offerings.[4]

Ripple's other arguments are equally unpersuasive. Ripple asserts that XRP is "fungible and indistinguishable." Red Br. 32. But Sostack does not contend that XRP tokens are themselves investment contracts. Blue Br. 43–44. Investment contracts were *created* by the circumstances surrounding Ripple's offers, including its public statements regarding how its efforts would increase the value of XRP. *See Hocking v. Dubois*, 885 F.2d 1449, 1457–62 (9th Cir. 1989). Those circumstances can change and alter the character of an asset regardless of its name or its purported fungibility. Here, only starting in 2017 were retail investors first led to expect that the XRP being offered was (i) released from escrow, (ii) on a regular supply schedule, (iii) to support a cross-border payments product, and (iv) that the value of XRP was and would be dependent on Ripple's efforts. A reasonable jury, moreover, could find that "XRP" was not uniformly known as "XRP" by the public until Ripple changed the name on exchanges in 2017. 7-ER-1517–20, 1524.

---

[4] Ripple also asserts that because the class period runs to 2023, Sostack's theory is that Ripple's 2017 offering continued until then. Red Br. 39. But the question is whether Ripple made a *separate* offering in 2017. Sostack's ability to represent class members injured before or after any point is a Rule 23 issue not relevant to repose.

### B. The Court Should Disregard Ripple's Abandonment of *Murphy*.

Ripple successfully persuaded the district court that *Murphy* determines "whether sales of securities are part of separate offerings or of a single integrated offering," and that because "[t]here is no evidence that would permit a reasonable jury to find that such separate offerings occurred," "the statute of repose is fatal." 2-ER-222-23.

Ripple now contends that *Murphy* is "irrelevant to repose." Red Br. 28. In just a few sentences, Ripple makes a conclusory argument that a separate unregistered offering does not start a separate repose clock under Section 13. *Id.* No appellate court has ever adopted that novel rule.

Even assuming Ripple can now properly advance this contradictory position, *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (parties are precluded "from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position"), Ripple was correct that *Murphy* controls.

Ripple does not deny that each separate *offering* of a security must be registered. In other words, it is the offering—not the security—that must be registered. *See SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007).

Section 13 provides that the statute of repose runs from each unregistered offering that violates Section 12(a)(1), not the first ever offering:

> In no event shall any such action be brought to enforce a liability created under . . . [Section 12(a)(1)] more than three years after the security was bona fide offered to the public.

15 U.S.C. § 77m. A contrary rule would mean that an issuer could make registered or exempt offerings of a security, and then more than three years later, commence a separate unregistered offering with impunity. That would allow an issuer to evade the Securities Act's registration requirements and would eviscerate the purpose of the Act to "protect[] investors by ensuring that companies issuing securities . . . make a 'full and fair disclosure of information' relevant to a public offering" in the registration statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) (citation omitted).[5]

Congress knew how to enact a time limitation linked to the first ever offer of a security and did not do so in Section 13. *See*, *e.g.*, 15 U.S.C. § 77d(a)(3)(A) (requiring registration of dealer transactions "taking place prior to the expiration of forty days *after the first date upon which* the security was bona fide offered to the public . . ." (emphasis added)). No similar "first date" modifier appears in Section 13. *See Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 814 (2024) ("[I]t is 'particularly inappropriate' to read language into a statute of

---

[5] Ripple's cases are not to the contrary. They concern different repose or limitations periods that run from the sale of a security, not each offering. *See*, *e.g.*, *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1300–01 (4th Cir. 1993); *Schlueter v. Cozad*, 674 F. Supp. 1351, 1354–55 (C.D. Ill. 1987); *Vassilatos v. Ceram Tech Int'l, Ltd.*, 1993 WL 177780, at *3 n.2 (S.D.N.Y. May 19, 1993). And they stand for the proposition that integration cannot avoid the rule that each *sale* starts the clock.

[repose] ‘when, as here, Congress has shown that it knows how to adopt the omitted language or provision.’” (citation omitted)). This statutory text, structure, and purpose is why no court of appeals has held that the three-year repose period runs once and for all from the first ever offer of a security, even if a separate offer later occurs.[6]

Ripple is wrong that *Murphy* is inconsistent with the statute. Red Br. 29–30. *Murphy* allows issuers to make an informed decision about how to offer securities in a manner that satisfies the disclosure obligations of the Act. Whether an offer is “bona fide” and “to the public” are fact-intensive questions. 15 U.S.C § 77m. Whether two offerings are separate is no different.

### C. Ripple Is Wrong that Sostack Forfeited Arguments that Ripple Offered Different XRP Securities in 2017.

Ripple first seems to agree that an offering of a different security would start a new repose period. *See*, *e.g.*, Red Br. 25. But then Ripple says Sostack never raised that argument, even though Sostack’s argument below included the fact that Ripple changed the economic reality of XRP offerings in 2017. And then Ripple backtracks yet again, arguing that it would “lead to absurd results” if the offering of a different security *did* start a different repose period. Red Br. 31–32. None of this is right.

[6] In *P. Stolz Family Partnership L.P. v. Daum*, the Second Circuit held that Section 12(a)(1) claims were untimely for a “single public offering” that started outside the repose period, 355 F.3d 92, 102 (2d Cir. 2004), and did not consider whether a separate offering would have started the clock.

Sostack argued below that Ripple's offerings of XRP (not the token itself), were investment contracts, and that those offerings were fundamentally different in 2017 from anything earlier.[7] *See* 2-ER-276–78. For example, Sostack asserted there was "a material dispute of fact regarding whether XRP sold before" Ripple upgraded the XRP Ledger in 2017 (when Ripple changed the software to implement the escrow) were "the same class of securities as those sold afterwards." 2-ER-277; 2-ER-268 n.5. Sostack thus raised the "basic 'claim'" that Ripple's 2017 offering was distinct from earlier sales. *Shen v. Garland*, 109 F. 4th 1144, 1158 (9th Cir. 2024) (citation omitted); *see*, *e.g.*, *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F. 4th 68, 71 (9th Cir. 2022).

Ripple now suggests that the first offering of a different XRP investment contract in 2017 would *not* start the repose clock, arguing that this would "lead to absurd results." Red Br. 31–32. But Ripple does not dispute that what matters for repose is "the economic realities underlying [the] transaction[s]," and not "the name" of the token. *Forman*, 421 U.S. at 849. A reasonable jury could conclude that Ripple's XRP offerings in 2017 had a different economic reality from those which came before; for example, only in 2017 did Ripple first escrow the XRP supply,

[7] Ripple does not explain why it matters that Sostack alleged and argued that "XRP is a security," or why a superseded version of a related class complaint limits what Sostack may argue. Red Br. 30. The relation back doctrine is not a rule that a later complaint is limited to the theories previously alleged. *See Johnson*, 574 U.S. at 12. That Sostack sought to certify a class starting in 2017 only supports his position that XRP offerings changed that year.

restrict it, and make new offers under fundamentally different circumstances to a new set of retail investors on third-party exchanges.

There is nothing unprecedented about an issuer offering a security, changing its economic reality, and then subsequently offering a different security using the same name. Nor is it unusual for an issuer to *change* an asset into part of "an investment of money in a common enterprise with profits to come solely from the efforts of others" at some time after it is initially offered. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) (involving offers of orange grove acreage that only became investment contracts because of additional agreements to cultivate plots on behalf of purchasers who were buying into an enterprise with profits depending on the efforts of others). On Ripple's view, a party could rarely, if ever, be liable for an unregistered offering of a security with the same name as a different security. That is not the law. *Forman*, 421 U.S. at 849.

Ripple provides no substantive argument that its pre-2017 marketing and sales even created an investment contract. Ripple says that Sostack never raised this issue below. Red Br. 31. But Sostack's argument and supporting evidence focused on how Ripple offered XRP investment contracts in 2017, when it changed the economic reality of its XRP offerings. The evidence showed that Ripple's CEO denied that Ripple sold XRP to the public, and that Ripple's efforts to encourage the public to invest in XRP did not begin until 2017. 2-ER-271–76.

Ripple accuses Sostack of taking a contradictory position. But Ripple made this precise argument in the SEC case. Ripple persuaded the court there that Ripple's prior programmatic sales, including those pre-2017, were not investment contracts by arguing that "the SEC relies on public statements from as late as August 3, 2020 . . . and the vast majority of the statements that the SEC cites were in 2017. . . . If [those] statements . . . were necessary to create a reasonable expectation of profits, then any offers and sales before [then] could not have been investment contracts." *SEC v. Ripple*, ECF 643, at 57.

### D. A Reasonable Jury Could Conclude that XRP Investment Contracts Were Not Bona Fide Offered to the Public Before 2017.

A reasonable jury could independently conclude that pre-2017, XRP investment contracts were only offered to crypto insiders with the specialized knowledge required to navigate the technically complex platforms where XRP was only then available. Offers to those *sophisticated* investors were not "bona fide offered to the public." 15 U.S.C. § 77m.

Ripple agrees that an offer is not "to the public" if it is directed to sophisticated investors. *See* Red Br. 23. But to *whom* Ripple offered XRP from 2013 on is a disputed issue of fact.

Ripple does not put forward any evidence that establishes, much less conclusively, that unsophisticated investors without technical skills and crypto expertise could buy XRP before 2017. *Id.* at 40–41. Ripple instead relies on sales

made "on the XRP Ledger's built-in exchange," *id.* at 27, but the cited evidence concerns the number of "wallets" on the XRP Ledger, 3-SER-648, not whether it was possible for unsophisticated investors to use those wallets to buy XRP or who (if anyone) controlled those anonymous wallets and when. A reasonable jury could instead conclude that until Ripple made a concerted effort to target average Joes in 2017, an XRP investment was not bona fide offered to the public; indeed, until 2017, it was even difficult for Ripple's executives to figure it all out. *See* Blue Br. 31. Nor does Ripple show that these technically complex and novel software systems were analogous to conventional services for over-the-counter stock trading.[8] *Cf.* Red Br. 24 & n.8.

But even if there were no dispute about whether XRP was offered to unsophisticated investors pre-2017, Ripple still cannot establish that every reasonable jury must find that pre-2017 sales were "bona fide" and offered "to the public." As Ripple recognizes, courts have explained that "in the context of . . . continuous offerings," the repose clock does not run until "information that is fundamental to assessing the value of a particular offering" is disclosed. Red Br. 43 (quoting *Yates v. Munic. Mortg. & Equity, LLC*, 744 F.3d 874, 897 (4th Cir. 2014));

[8] Nor can Ripple show that pre-2017 sales on third-party exchanges qualify. Section 13 is triggered only by a "culpable act or omission *of the defendant*." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*, 582 U.S. 497, 505 (2017) (emphasis added). That means *Ripple*, not someone else, must have "bona fide offered" XRP "to the public." But Ripple does not note any evidence that it sold on those exchanges through underwriters or otherwise.

Edwards Br., ECF 29, at 9 (explaining, consistent with *Yates* and similar authorities, that Section 13 requires "that members of the public at large are able to reasonably discover and evaluate the offer, without the issuer hiding it behind limited access or lack of disclosure"). The question is not whether a plaintiff is able to learn enough to file suit, Red Br. 42, but rather whether any pre-2017 offer fully disclosed the fundamental facts about the offer—an element Ripple never directly addresses.[9]

A reasonable jury could conclude that pre-2017, fundamental information about XRP offerings was not publicly available. Evidence shows that Ripple did not publish its XRP sales until 2017, Ripple represented to the public that it did not sell XRP to consumers, and Ripple admitted that the public could not have known that Ripple sold XRP to the public prior to 2017. Blue Br. 48. The statements about distributions that Ripple cites either were not widely distributed, 5-SER-965, or do not indisputably prove that Ripple sold XRP programmatically to consumers on the XRP Ledger, if it did so at all, 4-SER-905, 5-SER-965, 7-ER-1401–12. And the fact that XRP purchases were discussed by anonymous accounts on Ripple's forum proves nothing about what Ripple disclosed. 3-SER-652–58.

[9] Ripple argues that an offer is not bona fide *if and only if* it is simulated. Red Br. 24. But *Stolz* did not hold as much, and that would contradict the ordinary meaning of the term, which is "without fraud or deceit." Blue Br. 46. Transactions designed to conceal the existence of an offering are thus not bona fide. *Cf. SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 307–08 (S.D.N.Y. 2015).

Ripple also contends that gifts of XRP could start the repose period because the recipients might trade their XRP. Red Br. 41–42. But giveaways are not offers to purchase a security. Blue Br. 52. As Ripple argued in the SEC Action, when Ripple gave away XRP "there was no 'investment of money'" under *Howey*, "and thus no offer or sale of an investment contract." ECF 643, at 36–37. Moreover, only the defendant's bona fide offer triggers Section 13, and regardless, Ripple would also need to (but cannot) show both that offers downstream were made to unsophisticated investors pre-repose *and* that fundamental information about the offering was disclosed. Ripple's assertions of forfeiture are wrong because Sostack argued below that these giveaways were insufficient, 2-ER-276, and "it is claims that are deemed waived or forfeited, not arguments." *United States v. Blackstone*, 903 F.3d 1020, 1025 n.2 (9th Cir. 2018) (citation omitted).

Finally, Ripple misreads the statute when it asserts that a "bona fide offer[] to the public," 15 U.S.C. § 77m, does not need to be "*to* the public." *See* Red Br. 42. An offer that is not directed to the public generally, meaning unsophisticated investors, is not a "bona fide" offer "to the public." The incidental circulation of XRP from 2013 to 2015, when tokens were worth a tiny fraction of a penny, among a small number of accounts belonging to unidentified owners, *see* Edwards Br. 23–24, does not establish as a matter of law that an offering was made *to* the public. Ripple's Head of Markets wrote that at the start of 2017 there were "no clear signs

of [XRP's] use by anyone," a "lack of tools to buy or store" it, and "no distribution strategy." 7-ER-1534. A reasonable jury could conclude, as explained above, that Ripple only decided to direct sales to unsophisticated "average Joe" investors in 2017. The 20,000% increase in average daily trading volume and 35,000% increase in price at the end of 2017, 4-ER-705, viewed in the light most favorable to Sostack, further support that a reasonable jury could conclude that XRP securities had not been bona fide offered to the public beforehand.

## II. Ripple Solicited XRP Purchases.

Ripple also urges the Court to affirm on a ground the district court did not reach on summary judgment. It argues that because Sostack did not "purchase[] XRP from Ripple," it cannot be held liable under Section 12(a)(1). Red Br. 44. Ripple's argument is foreclosed by Supreme Court and Ninth Circuit precedent, and the district court rejected this theory at the motion to dismiss stage. 1-ER-100–01. This Court should reject it as well.

The Supreme Court has held that Section 12(a)(1) claims are not limited to direct sellers of a security. In *Pinter v. Dahl*, the Supreme Court decided that a person "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," falls within the scope of Section 12(a)(1)—in other words, as the Court explained, "the buyer 'purchased' the security from him." 486 U.S. at 647. The Court in *Pinter* rejected that Section 12

liability is limited to an owner who passes title, as Ripple argues here: "We do not read § 12(1) so restrictively." *Id.* at 644.

Ripple argues that only a solicitor who "acts in concert with a seller, urging a buyer to buy from that seller" is liable. Red Br. 46–47. Ripple never raised this new theory below. *See* 2-ER-244–48. The only basis for Ripple's position is a footnote in *Pinter* explaining that Section 12(a)(1) does not permit a buyer to "recover against his seller's seller." Red Br. 44 (quoting 486 U.S. at 644 n.21). But the whole point of *Pinter* is that the person who solicits a sale is a "seller" in the immediate sale within the meaning of Section 12(a)(1)—not a seller's seller. 486 U.S. at 643–44.[10] Rather than requiring privity between the solicitor and the seller, *Pinter* held that where a person solicits a sale "motivated at least in part by a desire to serve his own financial interests," "it is fair to say that the buyer 'purchased' the security from him and to align him with the owner in a rescission action." *Id.* at 648. The Court expressly contemplated that solicitors *other than* agents of the seller would be liable under the statute, and the two purported sellers in *Pinter* were not even each other's agents. *See id.* at 646 ("An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities

[10] For example, if A sells an unregistered security to B and B then sells it to C, C would not have a claim against A. But if A sold to B and then solicited C to make a purchase, then A would be liable to C as a solicitor. That is what Ripple did here.

Act.”). Following *Pinter*, courts routinely reject Ripple’s argument. *See*, *e.g.*, *Owen v. Elastos Found.*, 2021 WL 5868171, at *16 (S.D.N.Y. Dec. 9, 2021).

This argument also conflicts with circuit precedent. In *Pino*, the defendant posted on social media mass solicitations for investments in funds. The defendant argued that mass solicitations could not count as solicitation because *Pinter* requires “a relationship ‘not unlike contractual privity’” between a purchaser and a solicitor. 55 F.4th at 1259. This Court rejected that theory, holding that Section 12 must be read to “encompass those who engage in solicitation,” not only “mere owners” and “contains no indication that Congress was concerned with regulating only a certain type of solicitations.” *Id.* at 1259–60; *see also Wildes v. BitConnect Int’l PLC*, 25 F. 4th 1341, 1345–46 (11th Cir. 2022) (similar). The same reasoning controls here, and Ripple cannot cite any case adopting its “acts in concert” rule. *See* Red Br. 47; *cf. Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (no allegations that defendants “actively solicit[ed]” plaintiffs).

Other decisions also refute Ripple’s argument. In *Samuels v. Lido DAO*, the district court held that an issuer that “worked to get crypto exchanges to list” a crypto asset called LDO, that “promoted the listings and increases in LDO’s price,” and that encouraged people to purchase LDO could be held liable on a solicitation theory. 757 F. Supp. 3d 951, 968 (N.D. Cal. 2024); *see also Houghton v. Leshner*, 2023 WL 6826814, at *3–*5 (N.D. Cal. Sept. 20, 2023) (similar). And the court further

explained that the issuer, like Ripple here, was motivated to serve its financial interests from LDO sales, even those in which it did "not literally pass title," because the tokens issued were "only valuable if there is a liquid market on which to sell them, and because the tokens can be sold for more if LDO's market price is driven higher by high demand." 757 F. Supp. 3d at 969. That is true here. The evidence shows that Ripple, the issuer of XRP, started in 2017 to seek to get crypto exchanges to list XRP, extensively promoted those listings and increases in XRP price, and engaged in a new, massive marketing push to obtain purchases from unsophisticated investors. Blue Br. 14, 32.

Ripple is wrong that *Pinter* and *Pino* lack a limiting principle. Red Br. 48. Rather, *only* a person who both (i) successfully solicits a purchase and (ii) is motivated at least in part by a desire to serve his own financial interests or those of the owner can be liable as a solicitor under Section 12(a)(1). 486 U.S. at 647; 55 F. 4th at 1259. Ripple does not contest here that it meets those conditions.

Nor do *Pinter* and *Pino* "swallow the difference between Sections 11 and 12." Red Br. 48. In *Hertzberg v. Dignity Partners, Inc.*, the defendant argued that the Supreme Court's decision in *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), which held that Section 12(a)(2) misrepresentation claims are limited to the IPO, should similarly restrict Section 11 claims to the securities bought in the IPO. 191 F.3d 1076, 1080–81 (9th Cir. 1999). This Court held that *Gustafson's* interpretation of

Section 12(a)(2) does not control Section 11 because the two statutes are different. *Id.* Similarly, *Gustafson* does not limit Section 12(a)(1) or dictate its scope, because Section 12(a)(1) "contemplate[s] a broader scope than does Section 12(a)(2)." *Samuels*, 757 F. Supp. 3d at 971; 1-ER-99–100. Ripple's reliance on cases that concern the scope of Section 12(a)(2) or the statutory definition of an "underwriter" likewise are irrelevant. *See* Red Br. 48 n.24

Even assuming Ripple's novel "acts in concert" standard is somehow correct, which it is not, a reasonably jury could still conclude that Ripple was liable. Ripple did "act in concert" with third-party exchanges to list, promote, and sell XRP. *See*, *e.g.*, Blue Br. 14–15, 32.

### III. This Court Can and Should Address the Scope of the Class, the *Daubert* Order, and Costs.

The district court's order under Rule 54(b) entering judgment as to Sostack's class claims is a final judgment. "[A] party may appeal interlocutory orders after entry of final judgment because those orders merge into" it. *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 897 (9th Cir. 2001).

This Court may review class certification rulings, like any other interlocutory order, on appeal from a Rule 54(b) final judgment. *See*, *e.g.*, *Bowerman v. Field Asset Servs., Inc.*, 60 F. 4th 459 (9th Cir. 2023). These rulings were not excluded from the Rule 54(b) order. 1-ER-2–3 (final judgment on "class claims that were resolved in" Ripple's favor). It likewise makes no difference that the *Daubert* order

is interlocutory. This Court also has jurisdiction over costs. Ripple's bill of costs for Sostack's class claims was filed the same day the district court finally amended the judgment as to those claims. *Cf. Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1501–02 (5th Cir. 1992) (seeking costs only after judgment certified). Sostack's objections were directed to the district court and should be construed as a timely motion for review. *Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590, 592 (9th Cir. 2015).

## IV. The District Court Improperly Limited the Class.

Sostack and Ripple agree that federal law regulates transactions by foreign residents on domestic exchanges. *See* 5-ER-882 n.1. But the district court justified excluding from the class foreign residents who purchased on U.S. exchanges because "[o]ther countries should have the opportunity to regulate cryptocurrency." 1-ER-40 (citation omitted). Ripple does not try to defend this logic.

Instead, Ripple points to a statement at the class notice hearing about manageability. 3-SER-683 (18:12-17). But the district court did not rely on manageability in its orders regarding the scope of the class. *See Arroyo v. Rosas*, 19 F. 4th 1202, 1210 n.4 (9th Cir. 2021) ("[W]e cannot uphold the district court's decision based on discretionary grounds it did not invoke."). Nor are there any manageability concerns. At the hearing, counsel explained that it is able to obtain

contacts for the "vast majority of class members, well above the 70-percent threshold . . . normally see[n] in the class notice context." 3-SER-684 (19:17-21).

Ripple also fails to justify the district court's separate decision to exclude purchases on foreign exchanges based on *Mazza v. American Honda Motor Co.*, an inapplicable products liability case concerning whether under California choice-of-law rules, California statutes would apply to automobile purchases made by residents of other states from dealers in their states. 666 F.3d 581 (9th Cir. 2012). Ripple does not dispute that the district court therefore "applied the wrong legal standard, a per se abuse of discretion." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014). Ripple's speculative and unfounded concerns about manageability, Red Br. 52–53, were not the basis of the district court's ruling and cannot save Ripple on appeal.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed on the Section 12(a)(1) claims, and the orders limiting the class, excluding testimony, and taxing costs should be reversed as well.

Dated: September 10, 2025

Respectfully submitted,

*/s/* Marc M. Seltzer

SUSMAN GODFREY LLP
Marc M. Seltzer

Steven G. Sklaver
Oleg Elkhunovich
Nicholas N. Spear
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
nspear@susmangodfrey.com

Jason Bell
One Manhattan West
New York, NY 10001
(212) 336-8330
jbell@susman godfrey.com

TAYLOR-COPELAND LAW, P.C.

James Taylor-Copeland
Max Ambrose
501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 400-4944
james@taylorcopelandlaw.com
maxambrose@taylorcopelandlaw.com

*Counsel for Lead Plaintiff-Appellant and Class Counsel*

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**CERTIFICATE OF COMPLIANCE**

Form 8

9th Cir. Case Numbers 24-7599 & 25-483

I am the attorney for Appellant.

**This brief contains 6,984 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated ______________.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ *Marc M. Seltzer* **Date** September 10, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 24-7599; 25-483

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

1. Form 20: Notice of Intent to Unseal;
2. Appellant's Reply Brief

**Description of Document(s)** *(required for all documents)*:

**Signature** /s/ Marc M. Seltzer **Date** 09/10/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*